UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

FLEXTONICS AUTOMOTIVE USA, INC., f/k/a SATURN ELECTRONICS & ENGINEERING, INC. and EMPLOYEE BENEFIT PLAN FOR HOURLY EMPLOYEES, and EMPLOYEE BENEFIT PLAN FOR SALARIED EMPLOYEES

    Plaintiffs,

v.

BLUE CROSS AND BLUE SHIELD OF MICHIGAN,

    Defendant.

CASE NO.:

Hon.

**COMPLAINT**

Plaintiffs, Flextronics Automotive USA, Inc. f/k/a Saturn Electronics & Engineering, Inc. (hereinafter referred to individually as "Saturn"), and Employee Benefit Plan for Hourly Employees and the Employee Benefit Plan for Salaried Employees (hereinafter both of these Plaintiffs are referred to as the "Employee Benefit Plans" or the "Plan" or the "Plans", and all three of these complaining entities are referred to as "Plaintiffs"), by and through their counsel, the McNeely Law Office and Spangenberg Shibley & Liber LLP, hereby state as their Complaint against Defendant Blue Cross and Blue Shield of Michigan ("BCBSM") as follows:

**NATURE OF ACTION**

1. Saturn entrusted BCBSM to administer the healthcare portion of its self-insured Employee Benefit Plans. Pursuant to their contract, Saturn wired or sent large sums of money to BCBSM, which BCBSM was supposed to use to pay its hourly and

salaried employee health care claims. Saturn recently learned that, contrary to their contract, BCBSM was also skimming additional administrative fees from the money Saturn provided to pay claims. BCBSM's misappropriation of the assets of the Employee Benefit Plans is a clear violation of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.*, and Plaintiffs bring this suit to recover the misappropriated funds, costs, interest, attorney fees, and all other relief to which they are entitled, including disgorgement of BCBM's wrongful profits.

## PARTIES, JURISDICTION AND VENUE

2. At all times relevant, Plaintiff Flextronics Automotive USA, Inc. f/k/a Saturn Electronics & Engineering, Inc., is and was a Michigan corporation, with its headquarters in Farmington Hills, Michigan.

3. At all times relevant, Plaintiff Employee Benefit Plan for Hourly Employees was Saturn's ERISA-governed benefit plan for its hourly employees.

4. At all times relevant, Plaintiff Employee Benefit Plan for Salaried Employees was Saturn's ERISA-governed benefit plan for its salaried employees.

5. BCBSM is a Michigan non-profit health care corporation organized under the Nonprofit Health Care Corporation Reform Act, MCL 550.1101, *et seq* (the "Act").

6. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132 because Plaintiffs' claims arise under ERISA.

7. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because BCBSM resides in the Eastern District of Michigan. Venue is also proper pursuant to 29 U.S.C. § 1132(e)(2).

## GENERAL ALLEGATIONS

8. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs.

9. At all times relevant, Saturn has been headquartered in Rochester, Michigan and has been, in part, a supplier of electronic manufacturing services, solenoids and wiring to automotive, appliance, consumer, energy and industrial markets.

10. Saturn has offered health care benefits through the Employee Benefit Plans to its employees. Rather than buy health insurance to cover health care claims under the Plans, Saturn has opted to self-insure. Consistent with that choice, Saturn paid the actual employee health care costs covered by the Plans, up to a large threshold. Then, Saturn bought "stop loss" insurance to cover claims that exceed that threshold.

A. **Saturn Contracted with BCBSM to Administer Its Self-Insured Plan.**

11. The framework for the relationship between Saturn and BCBSM is contained in Administrative Services Contracts ("ASCs") into which the Parties entered. An ASC is a boilerplate document drafted by BCBSM and sets forth the rights and responsibilities of each party with regard to BCBSM's administration of the Plans.

12. Upon information and belief, the ASC between Saturn and BCBSM was executed by the parties effective January 1, 1998. As of the filing of this Complaint, Plaintiffs are unable to locate a copy of the 1998 ASC. A complete copy of the original 1998 ASC is believed to be in the possession of BCBSM. Attached as **Exhibit 1** is an Example Administrative Services Contract ("Example ASC"), dated July 1, 1997, that

Plaintiffs believe is a reasonable "template" representation of the 1998 ASC entered into by BCBSM and Plaintiffs.

13. On information and belief, the parties agreed that "BCBSM would process and pay, and [Saturn] would reimburse BCBSM for all Amounts Billed related to Enrollees' claims…" **Exhibit 1**, p. 3, ¶ (C).

14. "Amounts Billed" is defined in the Example ASC as "the amount [Saturn] owes in accordance with BCBSM's standard operating procedures for payment of Enrollees' claims." *Id* at 1.

15. "Enrollees" are defined in the ASC as "Employees and dependents of Employees who are eligible and enrolled for Coverage." *Id* at 2.

16. In exchange for its services, BCBSM was entitled to an administrative fee.

17. The Example ASC attached as **Exhibit 1** does not contain any pricing terms, and it is believed that the 1998 ASC between the Parties did not either. Rather, the specific fees to be paid by Saturn in exchange for the administrative services provided by BCBSM were enumerated in a concurrently executed "Schedule A," which was made part of the 1998 ASC. Together, the 1998 ASC and the concurrently executed Schedule A formed the Parties' original contract.

18. The ASC was renewed by the parties year after year. It is believed that prior to each calendar year, BCBSM would draft, a new Schedule A that would set the specific prices, services and payments. For example, the Schedule A believed to be applicable to 2007 is attached as **Exhibit 2**. Saturn does not have current possession and control of all of the referenced Scheduled A(s); they are believed to be in the possession of BCBSM.

B.  **Saturn Provided BCBSM With Plan Assets, Which Were Controlled by BCBSM, and Were Supposed to be Used to Pay Covered-Employee Claims.**

19. Under the ASC, Saturn was required to prepay the pro rata cost of estimated Amounts Billed for that time period (month or quarter), the pro rata cost of the estimated administrative charge for that contract year, and what BCBSM determined was necessary to maintain the prospective hospital reimbursement funding for that contract year.

20. The specific prepay amounts to be paid by Saturn were dictated by the Schedule A(s).

21. Under the ASC, BCBSM was required to provide Saturn with a detailed settlement showing Amounts Billed to and owed by Saturn during the prior available Quarter including any surplus or deficit amounts.

22. The settlements were used to adjust the future prepay amounts upward or downward depending on whether employee health care claims were higher or lower than what Saturn had previously prepaid. The Quarterly Settlements for the period July of 2008, through June of 2009, are attached as **Exhibit 3.** All of the Quarterly or Annual Settlements between the Parties are not in the possession and control of Plaintiffs, however, it is believed that BCBSM possesses a complete set.

23. Pursuant to the terms of the 1998 ASC and Schedule A(s), Saturn sent the required prepayments to a BCBSM-owned bank account, on a periodic basis from January 1, 1998 through the termination of the Parties' Agreement.

24. The prepayments sent to BCBSM's bank account were "Plan Assets" as defined by ERISA.

25. BCBSM had complete authority and control over the bank account and the Plan Assets sent to it by Saturn.

26. BCBSM (1) exercised discretionary authority and control with respect to management of the Plans; (2) exercised authority and control with respect to management and disposition of Plan Assets; or (3) had discretionary authority and responsibility in the administration of the Plans.

C. **BCBSM Illegally Skimmed Additional Administrative Compensation From the Plan Assets Entrusted to It.**

27. Saturn has learned that starting in 1994, BCBSM implemented a scheme to secretly obtain more administrative compensation than that to which it was entitled.

28. The scheme is outlined in an internal BCBSM memo that Saturn obtained from the afore-mentioned *Hi-Lex* litigation against BCBSM, and directly relates to the illegal overcharges. *See* **Exhibit 4**.

29. According to the memo, BCBSM's plan was to lower its disclosed administrative fee to give the illusion of lower cost, while at the same time artificially inflating the amounts it reported as hospital claims cost. BCBSM then kept the difference between what it was actually paying hospitals for employee claims and what it reported it was paying for hospital claims.

30. As an example, the scheme worked as follows: If BCBSM was required to pay a hospital $6,000 for a covered employee claim, it would report a charge of $6,810 ($6,000 claim plus a 13.5% add on), instead of passing on the actual $6,000 to the

customer (as required by the ASC and Schedule A's). BCBSM would keep the additional $810 for itself as administrative compensation.

31. Based on information provided by BCBSM, Saturn believes BCBSM skimmed Plan Assets equal to a variable percentage of all Peer 1-4 hospital charges incurred by Saturn employees. The actual amount, however, is unknown to Saturn and that information is solely in the control of BCBSM.

32. According to BCBSM's memo, the new "pricing methodology" was done because under its then-current practice, certain fees were reported as "an add-on to the bill, highlighted for all to see" and "many customers have complained and have threatened to leave" BCBSM as a result. *See* **Exhibit 4** at 1.

33. As explained by BCBSM, by hiding the additional administrative compensation in the claims cost it became "<u>no longer visible to the customer</u>." (Emphasis added). This in turn, resulted in the disclosed "administrative costs charged to customers . . . lin[ing] up better with competitor fees," thereby creating the illusion of a more competitive price. *See* **Exhibit 4** at 2.

34. In addition, Plaintiffs have learned that BCBSM may have also charged other hidden fees, including "subsidies" and "surcharges." Plaintiffs have further learned that BCBSM may have over-stated physician/professional claims as part of a program known as the Physicians Group Incentive Program. Upon information and belief, hidden fees have included "Other than Group" subsidies, "Contingency /Risk" surcharge(s), "Retiree" surcharge(s), and "Network Access" fee(s). All of the above-described fees, subsidies and surcharges are hereafter collectively referred to as "Hidden Fees."

35.     Plaintiffs now believe that BCBSM charged those Hidden Fees since 1998. In fact, Saturn has obtained a letter written by BCBSM wherein BCBSM admitted that the Hidden Fees "have been in place for Local ASC groups since 1994." **Exhibit 5**. To the extent BCBSM charged Plaintiffs Hidden Fees prior to 1998, Plaintiffs also seek recovery related to those prior years.

D.   **BCBSM Violated Both the Letter and the Spirit of the ASC(s) and Schedule A's by Charging the Hidden Fees.**

36.     Plaintiffs never agreed to pay the Hidden Fees.

37.     On information and belief, and as set out in the Example ASC, **Exhibit 1,** at page 6, Saturn agreed to certain "Financial Responsibilities" – nine specific amounts that Saturn agreed to pay BCBSM for administering the Employee Benefit Plans, *none of which include the Hidden Fees*:

1. Amounts Billed during the current Contract Year.
2. The hospital prepayment reflecting the amount BCBSM determines is necessary for its funding of the prospective hospital reimbursement.
3. The actual administrative charge.
4. The group conversion fee.
5. Any late payment charge.
6. Any statutory and/or contractual interest.
7. Stop Loss premiums, if applicable.
8. Cost containment program fee, if applicable.
9. Any other amounts which are the Group's responsibility pursuant to this Contract, including but not limited to risks, obligations or liabilities, deficit amounts relating to previous agreements, and deficit amounts relating to settlements.

38. Likewise, upon information and belief, the Schedule A(s) do not identify the Hidden Fees. Rather, the Schedule A(s) have a specific line item and specific dollar amount entitled "Administrative Charge" that does not include Hidden Fees).

39. For Example, on information and belief, the Schedule A for 2007, (**Exhibit 2**), provides for an administrative charge of $36.08 per covered employee per month. There is no additional administrative charge or fee to which Saturn agreed.

40. BCBSM now contends that it was allowed to assess the Hidden Fees because of an amorphous "disclosure" included in some Schedule A's.

41. The so-called "disclosures" of the Hidden Fees were, at best, ambiguous and misleading. Moreover, nothing in the alleged disclosures explained how much the fee would be or how it would be calculated.

42. Further, nothing in the Schedule A's indicated that Plaintiffs agreed to pay the Hidden Fees. In fact, BCBSM's charging of Hidden Fees was inconsistent with the ASC, which specifically identified Saturn's payment obligations, none of which included paying the Hidden Fees.

43. According to some of the Schedule A's, the Hidden Fees were allegedly charged to cover "costs associated with the establishment, management and maintenance of BCBSM's participating hospital, physician and other health provider networks...." Yet, the Hidden Fees actually charged by BCBSM were based on a flat percentage of Peer 1-4 hospital charges, without regard to the actual "costs" described by BCBSM.

E. **BCBSM Produced False and Misleading Settlement Statements and Form 5500's.**

44. The 1998 ASC required BCBSM to provide Saturn with a detailed settlement showing the amounts billed to and owed by Saturn and a settlement of the estimated and the actual administrative charges.

45. BCBSM provided quarterly and annual settlements, neither of which properly reported the Hidden Fees.

46. On information and belief, the format of the annual settlements varied slightly over the years, but in general they included reporting of "administrative fees." Saturn is not currently in possession and control of the annual settlements, however, they are believed to be in the possession of BCBSM.

47. The annual settlements provided by BCBSM to Saturn were false and misleading.

48. While the annual settlements purported to disclose the administrative fees paid by Saturn, the only administrative fees reported were the administrative fees specifically disclosed in the Schedule A's. The Hidden Fees were not disclosed.

49. In its April 29, 2011 letter, BCBSM acknowledged that the Hidden Fees were "administrative compensation" but did not explain why those fees were not reported in the settlements. *See* **Exhibit 5**.

50. The settlements also purported to disclose "actual claims paid by BCBSM," but this number was also false. BCBSM actually paid claims in a smaller amount and kept the difference for itself ("Hidden Fees").

51. BCBSM also provided Saturn with quarterly settlements, which purported to report "Total Claims Expense" and "Total Administrative Fee Expense." *See,* **Exhibit**

3. Saturn does not have a copy of the complete set of quarterly settlements, but they are believed to be in the possession of BCBSM.

52. The quarterly settlements were false because they overstated the actual claims and understated the administrative compensation received by BCBSM.

53. In addition to the annual settlements, upon information and belief, BCBSM provided Saturn with completed "Form 5500" information. All of the Form 5500s relevant to this matter are believed to be in the possession of BCBSM.

54. The Form 5500 is a form developed by the Department of Labor, Internal Revenue Service and Pension Benefit and Guaranty Corporation and is required to be filed by certain employers as part of their obligations under Title I and Title IV of ERISA, as well as under the Internal Revenue Code.

55. The Form 5500 required disclosure of total "claims paid." The amount reported as claims paid by BCBSM included both the actual claims paid to health care service providers and the Hidden Fees that BCBSM skimmed for itself as additional administrative compensation.

56. Upon information and belief, the Form 5500 reports were provided by BCBSM and were false in that they overstated the actual amount of claims paid.

57. The Form 5500 reports also required disclosure of all commissions, administration fees, and other compensation or retention received by BCBSM.

58. Upon information and belief, BCBSM only reported the disclosed administrative fees, not the Hidden Fees, under the category "Administration".

59. Upon information and belief, and under the category "Total Retention," BCBSM was required to report the total monies it received for administering the Plans,

but again only reported disclosed administrative fees, not the Hidden Fees that it also received.

60. Thus, the Form 5500 reports, as believed to have been drafted by BCBSM, were false because they understated the administrative compensation received by BCBSM.

61. The Form 5500's may have also been false because BCBSM failed to report all commissions paid.

62. BCBSM's strategy of secrecy worked as planned and Saturn was unaware that it may have been charged Hidden Fees.

F.  **BCBSM Fraudulently Concealed the Hidden Fees.**

63. As established by BCBSM's own internal memo, BCBSM engaged in a course of conduct intentionally designed to conceal evidence of its wrongdoing.

64. The Hidden Fees were not disclosed, much less agreed to, in the ACS or Schedule A's.

65. In addition, BCBSM repeatedly produced false settlement statements that (1) did not disclose the Hidden Fees at all and (2) understated the amount of administrative compensation it was receiving.

66. In furtherance of its secret scheme, BCBSM also issued a detailed training manual for its sales representatives entitled "Talking Points, Conversations with Customers, ASC Access Fee" in 2006. *See* **Exhibit 6**.

67. The training manual, which stated at the bottom of each page that it was "for BCBSM sales representative use only," started with an explanation of what the

Hidden Fees were and how they were calculated. Apparently, the Hidden Fees were so secretive, not even BCBSM's own sales representatives knew anything about them.

68. The thrust of the training manual was a section called "how to present the ASC access fee" which counseled BCBSM sales representatives to only discuss the fee as "part of the larger conversation you have with your customers" and that the "access fee should not be the focal point of your discussions." *See* **Exhibit 6** at 7.

69. Indeed, rather than allowing the BCBSM sales representatives to simply disclose the access fees in a clear and unambiguous fashion, the training manual "strongly recommend[s] that you meet with your underwriters to develop an individual strategy for each of your groups." *See* **Exhibit 6** at 7.

70. Thus, BCBSM's own training manual further shows its intentional concealment of the Hidden Fees.

71. Starting as early as 2004, a small, but vocal, contingent of BCBSM executives began raising concerns about the Hidden Fees and advocated for full disclosure. Internal discussions regarding whether to disclose the fees at all, and if so, the most innocuous way to do that continued for years.

72. Eventually, the executives who were advocating for "full disclosure" lost – BCBSM decided the fees would not be fully disclosed as an administrative cost on the contracts. Several of the executives who advocated for this position were terminated.

73. Over the course of the next several years, BCBSM management routinely discussed the Hidden Fees. Upon information and belief, discovery in companion litigation – *Hi-Lex Controls Inc. v. Blue Cross and Blue Shield of Michigan*, Case No. 11-cv-12557 (E.D. Mich.) - has uncovered emails and other communications relevant to this

allegation. These documents purportedly reveal (1) BCBSM knew that its customers did not understand they were paying Hidden Fees, (2) BCBSM was not interested in correcting those misunderstandings, and (3) if the Hidden Fee topic ever came up in discussions with customers, the fees were to be "down-played" and otherwise avoided by BCBSM sales representatives.

74.     An extensive factual record of BCBSM's wrong doing has been developed in the *Hi-lex* case. Due to the protective order entered in that case, Plaintiffs have not attached the documentary record to this public filing. However, Plaintiffs incorporate by reference the general factual allegations concerning BCBSM's Hidden Fee scheme set forth in Hi-Lex's Response to Defendant's Motion for Summary Judgment, which was filed under seal [Hi-Lex Dkt. No. 193].

75.     Spectrum was not on actual or constructive notice that BCBSM was charging the Hidden Fees, despite the exercise of reasonable diligence on its part.

G.      **The Hidden Fees Include an Illegal Cost Transfer Subsidy.**

76.     The Hidden Fees are comprised of a number of different fees, including what is known as the Other Than Group Subsidy ("OTG Subsidy").

77.     The OTG Subsidy is a cost transfer subsidy.

78.     BCBSM collected the OTG Subsidy from Saturn and other ASC customers.

79.     Not all ASC customers, however, were required to pay the OTG Subsidy, and BCBSM did not uniformly collect it.

80.     BCBSM used the OTG Subsidy to subsidize healthcare coverage for non-group clients who had no affiliation with Saturn.

81. This Court has already held that BCBSM's collection of the OTG Subsidy from ASC customers violated Michigan law and accordingly was a breach of BCBSM's fiduciary duties to its ASC customers under ERISA. *See Pipefitters Local 636 v. Blue Cross & Blue Shield of Mich.*, No. 04-73400, 2009 U.S. Dist. LEXIS 79509 (E.D. Mich., Sept. 3, 2009).

### COUNT I
### BREACH OF FIDUCIARY DUTY – ERISA

82. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs.

83. BCBSM was a fiduciary pursuant to 29 U.S.C. § 1002(21)(A) with respect to Saturn's Employee Benefit Plans because (1) it exercised discretionary authority and control over management of the Plans; (2) it exercised authority and control over management and disposition of Plan Assets; or (3) it had discretionary authority and responsibility in the administration of the Plans.

84. At all times relevant, BCBSM was a fiduciary because it exercised discretionary authority and control over management of the Plans.

85. As a fiduciary, BCBSM was required to, among other things, discharge its duties solely in the interest of the employees and beneficiaries of the Plans, preserve Plan Assets, fully disclose its actions and any compensation it was taking for its services, avoid making false or misleading statements, and abide by any statutory obligations or restrictions imposed on it.

86. BCBSM breached its fiduciary duties by, among other things:

    (a) Charging the Hidden Fees;

    (b) Failing to disclose the Hidden Fees;

(c) Submitting false and misleading quarterly settlement statements and annual summaries;

(d) Submitting false and misleading Form 5500 reports;

(e) Violating the Nonprofit Health Care Corporation Reform Act, MCL 550.1101, *et seq* (the "Act");

(f) Violating the Health Care False Claims Act; and

(g) Otherwise engaging in a pattern of conduct designed to mislead, confuse, deceive and otherwise trick Plaintiffs into paying more for its services than Plaintiffs were obligated to pay.

87. BCBSM's breach of its fiduciary duty has proximately caused substantial damages to Plaintiffs.

88. BCBSM fraudulently concealed that it was charging the Hidden Fees, the amount of those fees, and that it was otherwise violating its legal obligations to Plaintiffs.

89. Plaintiffs discovered the full extent of BCBSM's wrongful conduct within three years of filing this Complaint.

## COUNT II
## PROHIBITED TRANSACTION UNDER ERISA

90. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs.

91. BCBSM is a fiduciary pursuant to 29 U.S.C. § 1002(21)(A) and a "party in interest" pursuant to 29 U.S.C. § 1002(14).

92. As a fiduciary and party in interest, BCBSM was prohibited from engaging in certain transactions as set forth in 29 U.S.C. § 1106.

93. BCBSM's conduct with respect to the Hidden Fees was a prohibited transaction because, among other things, (a) it constituted a transfer to, or use by or for

the benefit of, BCBSM of Plan Assets, and (b) BCBSM dealt with Plan Assets in its own interest and for its own account.

94.	BCBSM's violation of 29 U.S.C. § 1106 has proximately caused substantial damages to Plaintiffs.

95.	BCBSM fraudulently concealed that it was charging the Hidden Fees, the amount of those fees, and that it was otherwise violating its legal obligations to Plaintiffs.

96.	Plaintiffs discovered what they believe to be the full extent of BCBSM's wrongful conduct within three years of filing this Complaint.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that the Court to enter judgment in their favor and against BCBSM as follows:

A.	Ordering BCBSM to provide a full and complete accounting of all Hidden Fees received by it from Plaintiffs;

B.	Declaring that BCBSM breached its fiduciary duty and otherwise violated federal law by (1) charging the Hidden Fees, (2) failing to disclose or report the Hidden Fees, and (3) submitting false and misleading quarterly

F.  Awarding monetary damages, costs, interest (including pre-judgment interest), disgorgement of BCBSM's profits, and attorneys' fees (including statutory attorneys' fees under ERISA) to the fullest extent of the law; and

G.  Awarding all other relief to which Plaintiffs may be entitled.

MCNEELY LAW OFFICE, PC
Attorneys for Plaintiffs

Date: February 23, 2017     By:     /s/
Edward J. McNeely III (P48818)
Business Address & Telephone:
338 Morris Ave, SE
Grand Rapids, MI, 49503
Phone: (616) 233-2501
Fax: (616) 233-2504
ejm@mc-law.com

SPANGENBERG SHIBLEY & LIBER LLC
Attorneys for Plaintiffs

Date: February 23, 2017     By:     /s/
Dennis R. Lansdowne (OH Bar 0026036)*
Nicholas A. DiCello   (OH Bar 0075745)*
Business Address & Telephone
1001 Lakeside Ave. East, Suite 1700
Cleveland, Ohio 44114
Phone: (216) 696-3232
Fax: (216) 696-3294
ndicello@spanglaw.com

* A motion to admit Messrs. Lansdowne and DiCello to this Court will be made after filing of this Complaint.